**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| JOSEPH PATTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.  2:20-cv-04236-NKL |
| | ) | |
| MISSOURI FARM BUREAU | ) | |
| SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>ORDER</u>**

Defendant Farm Bureau[1] argues that it is entitled to summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on Plaintiff Joseph Patton's Title VII and Missouri Human Rights Act ("MHRA") retaliation claims.  Doc. 132.  Because Mr. Patton concedes that he failed to properly exhaust the administrative remedies available under the MHRA, the Court GRANTS summary judgment in favor of Farm Bureau on Mr. Patton's MHRA claim.  Further, because Mr. Patton has failed to introduce evidence from which a reasonable jury could conclude that Mr. Patton's protected activity was a but for cause of his termination, as required to establish a *prima facie* case of retaliation, the Court GRANTS summary judgment in Farm Bureau's favor

---

[1] Mr. Patton names many Farm Bureau entities in his Complaint:  Missouri Farm Bureau Federation, Missouri Farm Bureau Services, Inc., Farm Bureau Town & Country Insurance Company of Missouri, Farm Bureau Life Insurance Company of Missouri, Legacy Life Insurance Company of Missouri, New Horizons Insurance Company of Missouri fka Farm Bureau New Horizons Insurance Company of Missouri, and Missouri Farm Bureau Insurance Brokerage, Inc. (collectively, "Farm Bureau").  The Parties agree that Mr. Patton was a Farm Bureau insurance agent, but dispute, for the purposes of Title VII liability, which entity or entities employed Mr. Patton.  Because the Parties agree that Mr. Patton was employed by at least one Farm Bureau entity, and because the Court concludes that Mr. Patton has failed to make a *prima facie* case of retaliation against *any* Farm Bureau entity, the Court need not resolve which entity employed Mr. Patton.  The answer is ultimately immaterial.  Accordingly, for ease of reference, the Court will refer to the Farm Bureau entities jointly as "Farm Bureau," unless a distinction is necessary.

on Mr. Patton's remaining Title VII claims.

## I.     Farm Bureau's Motion to Strike

Before proceeding to the merits of Farm Bureau's Motion for Summary Judgment, the Court must address Farm Bureau's Motion to Strike to clarify the scope of the summary judgment record. Doc 160. Farm Bureau identifies numerous ways in which Mr. Patton's submissions in opposition to Farm Bureau's Motion for Summary Judgment are deficient under both the Local and Federal Rules of Civil Procedure. Farm Bureau asks the Court to Strike the filings. Mr. Patton recognizes that the Court could strike his Opposition Materials,[2] Doc. 162 at 2, but he argues that the Court should not and should further permit him to file his entire opposition submission again— in effect giving him a third bite at the apple. For the following reasons, the Court GRANTS Farm Bureau's Motion to Strike, and Mr. Patton's Opposition Materials are hereby STRICKEN due to Mr. Patton's repeated failures to abide by both the Federal and Local Rules of Civil Procedure.

### A.  Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56

First, Farm Bureau argues that Mr. Patton violated Federal Rule of Civil Procedure 56 and Local Rule 56.1, both governing the submission of summary judgment materials, in various ways. Local Rule 56.1 is designed to streamline the resolution of summary judgment motions. The conciseness and specificity required by both rules reflects the reality that the parties know the case better than the judge, and that judges have neither the time nor the obligation to scour the record looking for factual disputes. *Nw. Bank & Tr. Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)

---

[2] Doc. 144 (Response to Motion and opposition to Defendants' Motion for Summary Judgment); Doc. 145 (Suggestions in Opposition to Motion for Summary Judgment); Doc. 156 (Plaintiff's Substituted Response to Defendants' Statement of Uncontroverted Material Facts); Doc. 157 (Plaintiff's Substituted Appendix).

("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions."). Accordingly, when opposing summary judgment, a party "must begin its opposing suggestions by admitting or controverting each separately numbered paragraph in the movant's statement of facts." Local Rule 56.1(b)(1). That party must also properly support a denial in accordance with Federal Rule of Civil Procedure 56(c), which requires supporting citations to particular parts of materials in the record. If the opposing party relies on any facts not contained in the movant's suggestions to oppose summary judgment, he must add his own concise listing of material facts. Further, each fact in dispute must be set forth in a separately numbered paragraph and properly supported in accordance with Federal Rule 56(c). Local Rule 56.1(d) also requires parties to submit the relevant portions of any document upon which they rely to move for or oppose summary judgment.

Farm Bureau first takes issue with Mr. Patton's response to Farm Bureau's Statement of Material Facts. Doc. 156. Mr. Patton did file a response to Farm Bureau's Statement of Undisputed Material Facts. *See* Doc. 156. However, Mr. Patton's 53-page submission violates the Local and Federal Rules in various ways. First, that filing contains paragraph long, and at times page long, arguments and conclusory assertions couched as qualifications to Farm Bureau's Statement of Material Facts. Mr. Patton's repetitive and lengthy arguments "obfuscate[ed] any concise and specific statements of material fact that were contained within" his response. *Nw. Bank & Tr. Co.*, 354 F.3d at 725. This requires the Court, and Farm Bureau, "to engage in the proverbial search for a needle in the haystack" to identify Mr. Patton's positions and to determine whether the record supports them. *Id.* This is true even after the Court granted Mr. Patton leave

to file a Substituted Response to Farm Bureau's Statement of Material Facts after his three extended opposition deadlines. Doc. 155.

Second, to complicate matters further, Mr. Patton's Opposition Materials—including both his Suggestions in Opposition and his Response to Farm Bureau's Statement of Material Facts—relied on many facts that were not originally referenced by Farm Bureau, and accordingly Local Rule 56.1(b) required that he separately list those facts in numbered paragraphs so that Farm Bureau could respond. He did not.

Mr. Patton also submitted an Appendix as required by Local Rule 56.1(d). Mr. Patton's first Appendix was incomplete, so the Court permitted him to file a substitute. However, even the Substituted Appendix, Doc. 157, is both incorrect and incomplete. It does not include all the exhibits cited by Mr. Patton and it omits relevant portions of cited exhibits. Furthermore, Mr. Patton inconsistently (and incorrectly) cites to his appendix throughout his Opposition Materials.

When a party fails to appropriately follow the Federal or Local Rules governing summary judgment, the Court has broad discretion to remedy the violation. The Court may deem the movant's facts admitted, decide summary judgment on the movant's submission alone, or issue any other appropriate order. Fed. R. Civ. P. 56(e); *see also* Local Rule 56.1(b)(1); *Nw. Bank & Tr. Co.*, 354 F.3d at 725 (deeming movants statement of material facts admitted because nonmovants response was improper—was voluminous and replete with conclusory allegations and legal argument—and further considered only additional facts included in nonmovants suggestion in opposition given their statement of additional material facts similarly failed to comply with identical Iowa local rules); *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990–91 (8th Cir. 2006) (finding district court did not err by disregarding nonmovant's response to movant's statement of material facts and own statement of material fact when both failed to comply with W.D. Mo. local

rule, including being overlength and included excessive responses to non-disputed facts, legal argument, and erroneous citations); *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) (district court did not err in deeming Defendants' facts admitted because Plaintiff failed to comply with local rule requiring citations to an appendix of exhibits attached to opposition).

Given the substantial confusion and burden created by Mr. Patton's failure to follow the applicable rules, and the unreasonable burden placed on Farm Bureau because of Mr. Patton's various violations, the Court will STRIKE Mr. Patton's Opposition Materials. Furthermore, to the extent that Mr. Patton intended his Response to Farm Bureau's Motion to Strike, Doc. 162, to be construed as a second motion to substitute his *entire* Opposition submission, that Motion is DENIED. The Court granted Mr. Patton three extensions to file his opposition materials, and further granted Mr. Patton's request to substitute certain filings because the originals were deficient. The Court will not now entertain a renewed motion to substitute because his opposition materials are still deficient. *Jones*, 461 F.3d at 990 ("We believe the local rule itself provides adequate notice of the requirements to which a party must adhere. The district court is not required to study laboriously a 480–page pleading and the record materials cited therein to determine that it is non-compliant with the rules, and then afford the party another opportunity to file a pleading that complies.").

## II. Summary Judgment Would Still Be Granted Even If the Court Considers the Admissible Evidence Contained In Mr. Patton's Opposition Materials

While the Court has determined that Mr. Patton's entire Opposition Submission should be stricken because of his consistent failure to abide by the Local and Federal Rules of Civil

Procedure,[3] as explained more thoroughly below, even if the Court were to consider Mr. Patton's Opposition Materials that are supported by admissible evidence, they would not defeat Farm Bureau's Motion for Summary Judgment.[4]

### A. Disputed Affidavits

As a preliminary matter, before moving to the merits of Farm Bureau's Motion for Summary Judgment, the Court must address some additional evidentiary concerns related to several affidavits submitted to support Mr. Patton's Opposition Materials.

### 1. Doc. 157-3 and 157-4, Affidavits of Darcy Arnold and Nathan Essary

First, the Court must address the admissibility of affidavits offered by Darcy Arnold and Nathan Essary, two former Farm Bureau agents in different markets. Doc. 157-3; Doc. 157-4. Farm Bureau identifies several issues with these affidavits. First, Farm Bureau notes that Doc. 157-3 contains unsigned versions of both affidavits. A signed version of Nathan Essary's affidavit is in the record, Doc. 157-4, so the Court will address it separately. However, a signed affidavit by Darcy Arnold is not in the record. The Eighth Circuit has unequivocally held that an unsigned affidavit is not sufficient evidence to support a party's position on summary judgment. *Mason v. Clark*, 920 F.2d 493, 495 (8th Cir. 1990). Accordingly, even if they were not stricken, the Court could not consider the unsigned affidavits as competent evidence to defeat summary judgment.

---

[3] Even if the Court did not strike Doc. 144 as a sanction for Mr. Patton's violations of Federal and Local Rule, Mr. Patton's 17-page "Response and Opposition to the Defendants' Motion for Summary Judgment" is improper under Rule 56 and therefore the Court does not consider it for any purpose. Doc. 144.

[4] The Court stayed the deadline by which Farm Bureau could reply to Mr. Patton's Opposition Materials while the Court resolved the pending Motion to Strike. However, because the Court struck Mr. Patton's Opposition in its entirety, there is nothing to which Farm Bureau needs to respond. Further, because the Court is granting summary judgment to Farm Bureau on the current record, no further briefing by Farm Bureau is necessary.

The signed version of Mr. Essary's affidavit fares no better.[5] Farm Bureau's primary objection to these affidavits is that they, in large part, are not based on the affiants' personal knowledge. It appears Mr. Patton requested that Ms. Arnold and Mr. Essary review specific exhibits and form opinions. The affidavits discuss: (1) whether the actions of Mr. Lacey constituted a violation of Farm Bureau policy; (2) Farm Bureau's duties in response to Plaintiff's complaints; (3) whether Farm Bureau's sales requirements and expectations were realistic or attainable as applied to Mr. Patton; (4) Farm Bureau's policies and practices in general. Neither witness was disclosed as an expert. Accordingly, pursuant to both Fed. R. Civ. P 56(c)(4), which requires affidavits in opposition to summary judgment must be made on personal knowledge, and Fed. R. Evid. 701, which limits lay opinions to those that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702[,]" significant portions of both affidavits are improper.

Mr. Essary's affidavit is also irrelevant. As the Court explains in more detail throughout this Order, none of Mr. Essary's (or Ms. Arnold's) affidavit testimony is helpful to determining any fact at issue in Mr. Patton's retaliation case. Even assuming Mr. Lacey violated Farm Bureau policy in the Fall of 2019 and that Farm Bureau's expectations—which were universally applied to all agents—were unreasonable, Mr. Patton is no closer to establishing a causal link between his report of Mr. Lacey's misconduct and his termination. Furthermore, neither Ms. Arnold or Mr. Essary worked in Mr. Patton's market, and accordingly their observations about Farm Bureau supervisors and their practices—even if they were based on personal knowledge—are not relevant.

---

[5] Because Ms. Arnold's affidavit is nearly identical to Mr. Essary's, for the same reasons that the Court would not consider Mr. Essary's affidavit, the Court would not permit Mr. Patton to submit a signed version of Ms. Arnold's affidavit.

Neither affiant explained why any of their observations would apply to Mr. Patton's supervisors or are otherwise generalizable. For all these reasons, neither Mr. Essary's affidavit, nor a signed version of Ms. Arnold's, would be relevant, let alone defeat summary judgment.

### 2. Doc. 157-1, Affidavit of Joseph Patton

Next, Mr. Patton filed a 49-page affidavit. Farm Bureau identifies various issues, including that: (1) most of the paragraphs are not used to admit or deny any of Farm Bureau's Statement of Material Fact; (2) many paragraphs are needlessly duplicative and included in bad faith;[6] and (3) some paragraphs are not based on personal knowledge. Any of these objections could provide an independent basis to strike Mr. Patton's affidavit. However, as explained below, even considering Mr. Patton's affidavit, and the rest of the Substituted Appendix, Farm Bureau is still entitled to summary judgment.

### 3. Whether Mr. Patton or His Attorneys Should Be Sanctioned for Submitting Affidavits In Violation of Fed. R. Civ. P. 56(h).

Farm Bureau also asks the Court to find that Mr. Patton acted in bad faith or solely to delay by submitting various affidavits in violation of Fed. R. Civ. P. 56(h). While Mr. Patton's affidavits certainly burdened the Court and Farm Bureau, and significantly and unjustifiably delayed the resolution of this matter, the Court is not satisfied that they were filed in bad faith. Instead, they form part of a consistent pattern of lackluster performance by Mr. Patton's attorneys. Lack of skill does not necessarily equate to a lack of good faith, and accordingly the Court will not sanction Mr. Patton for violating Fed. R. Civ. P. 56(h).

---

[6] Specifically, ¶¶ 22, 23, 25, 29, 29 (second paragraph), 33, 37, 38, 54, 60, 65 – 68, 71, 83, 90, 94, 115, 118, 120-121, 124, 126-127, 130-131, and 135 all restate the same argument that Farm Bureau's expectations and requirements fail to consider local demographics. In addition, ¶¶ 25, 29, 33, 38, 42, 61-65, 68, 70, 76-77, 81–82, 84–85, 90-91, 110, 115, 118, 126–128, 130, and 131 all restate Mr. Patton's arguments that the goals set for him were not reasonable or attainable.

### B. Facts Supported by Admissible Evidence[7]

Mr. Patton was a Farm Bureau insurance agent. He began working in January 1990 and continued until his termination on June 4, 2019. He did so from an office located in Lawrence County, Missouri.

As early as October of 2011, Farm Bureau expressed concern regarding Mr. Patton's work performance. Doc. 134-1, A-55 (Mr. Patton Work Plan dated 10/5/2011). Farm Bureau's concerns continued, and in September 2013, Farm Bureau placed Mr. Patton on probation and a work plan designed to address his performance deficiencies. *Id.* at A-56–57 (Written Notice of Probation and Work Plan, effective 9/5/2013). Farm Bureau identified several issues, including Mr. Patton's inability to "maneuver in [its] SDI auto system" to appropriately serve clients, Mr. Patton's level of customer service, his improper conduct as an agent and representative of Farm Bureau, and lack of respect to office staff and clients. Doc. 157-8. Several months later, in late December 2013, Farm Bureau supervisors reminded Mr. Patton of his obligations under his work plan. *Id.* at A-58. After failing to meet the expectations set by Farm Bureau, Mr. Patton was again placed on probation, starting in January 2014. *Id.* at A-59. Mr. Patton met his targets in January and February, so Farm Bureau continued his probation, but took no additional actions. Supervisors did, however, express concern because Mr. Patton's book of business had decreased in each of the prior three years and had already decreased in the first few months of 2014. *Id.* at A-61.

Mr. Patton again struggled to meet Farm Bureau's expectations in 2018. On January 18, 2018, Randy DeBoutez, Mr. Patton's new supervisor, checked in regarding Mr. Patton's production and encouraged him to do better to comply with Farm Bureau's minimum sales

---

[7] These facts are viewed in the light most favorable to Mr. Patton, as the nonmovant. *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971 (8th Cir. 2019).

expectations. *Id.* at A-62. Mr. Patton testified in his deposition that he understood, from these communications with his supervisor, that it was important to Farm Bureau that he work on his production. *Id.* at A-09–10; 104:22–105:1 (Patton Dep.). Mr. DeBoutez again expressed concern to Mr. Patton in February 2018, and Mr. Patton again understood that his supervisors were concerned about his performance. *Id.* at A-11–12; 106:16–107:2. Farm Bureau contacted Mr. Patton about his decreasing sales again in March 2018, and worked with Mr. Patton to develop a plan for improvement. Mr. Patton still understood that his performance was important to Farm Bureau, and that his supervisors were concerned about his performance. *Id.* A-12–A13, at 107:3–108:2. Indeed, Mr. Patton explained that Farm Bureau regularly checks in with all employees who struggle to meet their sales targets, and consistently expresses concern to those who underperformed; "It's not just [Mr. Patton]" that Farm Bureau expected to meet sales minimums. *Id.* A-13, at 108:3–6.

Farm Bureau also expressed concern to Mr. Patton in May 2018, multiple time in both June and July 2018, and again in August 2018. *Id.* at A-65 (May 2018 Production Email); A-66–A-67 (June 8, 2018, Production Email); A-68 (June 12, 2018, Production Email); A-69, July 2, 2018, Production Email; A-71 (July 26, 2018, Production Email); A-72–A-73 (August 2018 BOP Email). Mr. Patton's supervisor twice expressed concern in October 2018 and raised Mr. Patton's consistent trend of poor performance. *Id.* at A-74 (October 4, 2018, Production Email); A-75 (October 9, 2018, Production Email). While Mr. Patton explained to Farm Bureau, various times, that its expectations were unreasonable, Mr. Patton nevertheless understood that Farm Bureau was concerned about his performance after each conversation, and that Farm Bureau expected his performance to improve. *Id.* at A-13–A-14, at 108–109; A-15, at 110; A-16, at 118; A-17–A-18, at 128–129. Farm Bureau's minimum sales expectations were applicable to all Farm Bureau

insurance agents, and despite never arguing with Mr. Patton's critiques, Farm Bureau never altered its expectations of Mr. Patton—or any agent.

Mr. Patton's performance deficiencies eventually caught the attention of Mr. DeBoutez's supervisor, Farm Bureau's Senior Director of Marketing Jim Berrey, who directed Mr. DeBoutez to place Mr. Patton on a work plan. *Id.* at A-75 (October 9, 2018, Production Email). Mr. DeBoutez informed Mr. Patton that Mr. DeBoutez would be developing a work plan to assist Mr. Patton's production numbers. Mr. DeBoutez requested that Mr. Patton identify any additional training that might benefit him. Mr. Patton never responded to this email, and when Mr. DeBoutez raised it with him later, Mr. Patton just said "he needed to get it done." *Id.* at A-76. Mr. Patton did not know that Mr. DeBoutez was directed to put Mr. Patton on a work plan. While Mr. DeBoutez continued to work with Mr. Patton to increase his production, he was not placed on a formal work plan at that time.

Mr. Patton's poor performance continued into 2019. In January 2019, Mr. DeBoutez informed Mr. Patton that, across all lines of insurance, Mr. Patton's 2018 numbers were below minimum expectations. *Id.* at A-78. Mr. DeBoutez further asked Mr. Patton to prepare an improvement plan and to meet with him in his office to discuss improving Mr. Patton's production, which was not at an "acceptable level[]." *Id.* On January 18, 2019, Mr. Patton and Mr. DeBoutez met to discuss Mr. Patton's work performance. During this meeting, Mr. Patton informed Mr. DeBoutez that Farm Bureau's expectations were unrealistic in his market and reiterated that he was still a "productive" agent. While Mr. DeBoutez never challenged Mr. Patton's assertions, he did not change the expectations placed on Mr. Patton. During that meeting, Mr. Patton provided Mr. DeBoutez with a list of steps he intended to take to improve his performance. *Id.* at A-20, at 147; A-79 (list of action items created by Mr. Patton, on Mr. Patton's stationary). Mr. DeBoutez

provided Mr. Patton a summary of their discussion and a work improvement plan, which included specific production expectations.[8]  Mr. Patton left the January 18 meeting with the understanding that his performance needed to improve.  *Id.* at A-20, at 147:15–18.[9]

Yet his performance did not improve.  Mr. DeBoutez reached out to Mr. Patton three times in February 2019 about his poor performance and the requirements of his work plan.  Not only was Mr. Patton underperforming, but it appeared that he had made almost no progress towards the work plan.  *Id.* at A-81 (February 4, 2019, Production Email); A-82 (February 7, 2019, Email); A-83 (February 14, 2019, Email).

At this point, to address Mr. Patton's performance, Farm Bureau decided to set a meeting with Mr. Patton at Farm Bureau's headquarters in Jefferson City between Mr. Patton, Mr. DeBoutez, and Farm Bureau's Director of Sales Brian Cox.  At Mr. Patton's request, Jenna Korsmeyer, Farm Bureau's Director of Human Resources, also attended.  Farm Bureau tried

---

[8] Mr. Patton purports to deny this fact.  *See* Doc. 156, at 41.  However, nothing he cites suggests that Mr. DeBoutez never provided this summary, he simply argues that Mr. DeBoutez omitted Mr. Patton's critiques of Farm Bureau's expectations. The Court will assume that Mr. Patton did inform Mr. DeBoutez that Farm Bureau's expectations were unrealistic, or even impossible, for the purposes of summary judgment.  Even so, as discussed below, the reasonableness of Farm Bureau's universally applied expectations is not material to Mr. Patton's Title VII claim.

[9] Mr. Patton also attempts to deny this fact.  But again, nothing he cites directly contradicts that he knew Farm Bureau expected him to improve his performance.  Doc. 157-1, ¶¶ 120–27, 130–31. In his deposition, Mr. Patton specifically stated he knew—in the January 2019 meeting—that Farm Bureau expected his performance to improve.  The evidence Mr. Patton cites to deny Farm Bureau's Statement of Material Fact 59 provide numerous explanations for his poor performance, including that Mr. Patton thought Farm Bureau's expectations were unreasonable, that they were generally applicable to all agents despite vastly different markets, and that, even though Farm bureau would "always say 'sell more insurance'" Doc. 157-1, at ¶ 122, it had not previously formally placed Mr. Patton on a work plan or probation.  That does not defeat the fact that Farm Bureau expected—and always had expected—Mr. Patton, an all agents, to meet Farm Bureau's sales expectations.  Farm Bureau insistently communicated to Mr. Patton that his performance needed to improve and worked with Mr. Patton to make a plan. Nothing Mr. Patton cites suggests otherwise.

unsuccessfully to meet with Mr. Patton multiple times. Each time, Mr. Patton stated he could not attend. Doc. 157-22, at 21:7–24. After three weeks of trying, Mr. Patton agreed to meet with Farm Bureau on April 18, 2019. *Id.*

The meeting was called to address Mr. Patton's consistent performance issues, and so Mr. DeBoutez began by reviewing his January 2019 conversation with Mr. Patton. He then reviewed the production results from the first quarter of 2019. Mr. DeBoutez explained that Mr. Patton had not improved and that he continued to perform below the normal requirements of Farm Bureau and the requirements of Mr. Patton's work plan. Doc. 157-21. Mr. DeBoutez explained that Mr. Patton's current performance could not continue; there needed to be signs of improvement. *Id.* The Farm Bureau supervisors, multiple times, asked Mr. Patton how they could support Mr. Patton's sales efforts. Doc. 157-1, ¶ 132 (Patton Affidavit); Doc. 157-21.

During this meeting, Mr. Patton raised several complaints unrelated to his production, including issues related to Skylar Lacey, another agent in Mr. Patton's office. One of Mr. Patton's issues with Mr. Lacey—in addition to interpersonal problems—was an inappropriate comment made to LaTosha West, a female employee in Mr. Patton's office. Specifically, Mr. Patton claims that Ms. West came to him in tears after Mr. Lacey asked her if she was "on the rag." Doc. 156, at 21. Mr. Patton believed that Mr. Lacey had violated Farm Bureau policy, and that Mr. Patton was obligated to report it. Mr. Lacey made the comment in the Fall of 2018. The April 2019 meeting—months later—was the first time Mr. Patton raised Mr. Lacey's conduct with anyone at Farm Bureau. Doc. 156, at 47–48 (Mr. Patton admitting Defendants' SOMF 68).

While the Farm Bureau employees told Mr. Patton that they would look into the situation, they reminded him that the meeting was called to discuss Mr. Patton's consistent poor performance, and that none of the additional issues affected Mr. Patton's ability to sell insurance.

13

Doc. 157-21. That said, the Farm Bureau employees told Mr. Patton that just because they were not addressing Mr. Patton's report in the meeting did not mean they were ignoring the situation in Mr. Patton's office. But, since the meeting had been called to discuss Mr. Patton's performance, the Farm Bureau employees attempted to focus on helping Mr. Patton's sales numbers. *Id.* At the meeting, Mr. Patton signed a document summarizing the conversation. The document explained the requirements of Mr. Patton's work plan, that he had not made significant production improvements since the work plan was implemented in January 2019, and that if certain requirements were not met before the end of April, probation would be implemented, effective May 1, 2019. Doc. 134, at A-84. Mr. Patton also certified that he understood that corrective action was required, and that potential consequences would follow failing to meet Farm Bureau's expectations. *Id.* Despite testifying numerous times that he understood that his supervisors were concerned about his production, Mr. Patton claims that he had was never told, prior to the April 2019 meeting, that Farm Bureau intended to place him on probation or discharge him.

Mr. Patton failed to improve his performance by May 1, 2019, and accordingly, Mr. Patton was placed on probation. Doc. 134-1, A-90. Mr. Patton signed an Agent Performance Improvement Notification & Agreement form on May 8, 2019, which stated specific performance expectations and timelines by which to complete them. By signing, he certified that he understood that he "must meet these requirements in order to continue employment with Missouri Farm Bureau" and that he may be terminated earlier if he "is deemed to be harming currently established customer base, not making sufficient progress, or for misconduct." *Id.* Mr. Patton failed to meet

the expectations established by his probation, and he was terminated on June 4, 2019. Doc. 156, at 49–50. [10]

Farm Bureau did follow up with Ms. West, the employee Mr. Lacey harassed. Farm Bureau's Director of Human Resources sent Ms. West's supervisor, Melissa Smith, to speak to Ms. West in the Lawrence County office. Ms. Smith spoke to Ms. West a little more than a week after Mr. Patton made his report, and spoke with her for an hour and fifteen minutes. Doc. 157-25. Ms. West confirmed that Mr. Patton and Mr. Lacey did not get along. Ms. Smith asked Ms. West if either Mr. Patton or Mr. Lacey had said anything that offended her. Ms. Smith responded that she could not think of anything. Ms. Smith followed up, asking if either employee had said something that would have offended someone else. To that, Ms. West responded that Mr. Lacey had once said something to the effect of "[Ms. Smith] was grouchy because it was 'that time of the month.'" *Id.* Ms. West told Ms. Smith that Mr. Lacey's comment "didn't bother her at all;" she just "laughed it off and retorted something about feeling sorry for his wife." *Id.* In fact, Ms. West informed Ms. Smith that she and Mr. Lacey "[got] along great." *Id.* Mr. Patton claims that Ms. West's report is untrue because, shortly after Mr. Lacey made the comment in the Fall of 2019, Ms. West came to him in tears over Mr. Lacey's comment. Nevertheless, Ms. West told Ms. Smith that Mr. Lacey apologized, and Ms. West never reported it. Ms. West was concerned she was in trouble for not reporting Mr. Lacey. Ms. Smith told Ms. West that if Mr. Lacey's comment was not offensive, she did not need to report it. *Id.* There is no evidence that Ms. West requested any action be taken or otherwise complained about Mr. Lacey—formally or informally—beyond her initial complaint to Mr. Patton.

---

[10] Mr. Patton was an at will employee, and nothing in his employment contract requires Farm Bureau do anything more than provide Mr. Patton written notice of termination. Doc. 157-6 (Agent's Memorandum of Employment Terms); Doc. 157-7.

### C. Legal Standard

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R.*, 931 F.3d 664, 669 (8th. Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1062 (8th Cir. 2020) (holding that summary judgment should be granted only when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law).

### D. Discussion

#### 1. Whether Farm Bureau is Entitled to Summary Judgment on Mr. Patton's Retaliation Claim Under the Missouri Human Rights Act

Count I of Mr. Patton's Complaint pled retaliation under Title VII and the Missouri Human Rights Act ("MHRA"). Mr. Patton has now stipulated that he failed to properly exhaust his administrative remedies under the MHRA, as the Missouri Commission on Human Rights did not issue Mr. Patton a Right to Sue Letter, and Mr. Patton did not appeal. Doc. 156, at 4 ¶¶ 8–9 (Mr. Patton admitting that he did not receive a Right to Sue letter and that there is "no cause of action

still pending against Defendants under [the MHRA].").  Mr. Patton never formally dismissed his MHRA claims, and accordingly they are still before the Court.

Because Mr. Patton has admitted that he failed to properly exhaust his MHRA claims, the Court GRANTS Farm Bureau's Motion in favor of all Defendants on Mr. Patton's MHRA claim.

### 2.  Whether Farm Bureau is Entitled to Summary Judgment on Mr. Patton's Title VII Retaliation Claim

Title VII contains an antiretaliation provision that prohibits an employer from discriminating against an employee because the employee opposed a practice made unlawful by Title VII.  *Muldrow v. City of St. Louis*, 30 F.4th 680, 690–91 (8th Cir. 2022).  Because Mr. Patton relies on indirect evidence to prove his Title VII retaliation claim, the Court must evaluate it through the three-step *McDonnell Douglas* framework.  *See id.* at 691.  "To establish a prima facie case of retaliation, an employee-plaintiff must show that '(1) she engaged in protected conduct, (2) she suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct.'"  *Id.* (citation omitted).  Then, "[i]f the employee establishes a prima facie case, 'the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action.'  If the employer satisfies its burden, 'the burden then shifts back to the employee to put forth evidence of pretext.'"  *Id.* (citations omitted).

The Parties do not dispute that Mr. Patton engaged in protected activity—reporting what he believed to be sexual harassment and a hostile work environment—and that Farm Bureau took a materially adverse employment action.  The Court agrees that the first two elements of Mr. Patton's *prima facie* case are met.  Termination is the quintessential material adverse employment action, and, regardless of the merits of his complaint, it is enough that Mr. Patton had a good faith belief that Mr. Lacey's conduct violated the law.  *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714–15 (8th Cir. 2000).  However, before proceeding to the third element of *prima facie* case—

causation between the protected activity and the material adverse employment action—the Court must determine whether termination was Farm Bureau's only adverse employment action.

Mr. Patton appears to argue that being placed on a work plan and probation prior to his termination were material adverse employment actions. They were not. To be a material adverse employment action, Mr. Patton's negative feedback, work plans, and probation must have produced a material employment disadvantage; for example, impacted his pay, responsibilities, benefits, or seniority. *See, e.g.*, *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891–92 (8th Cir. 2005) (holding placement of employee on administrative leave pending investigation was not adverse employment action when employee kept the same pay and benefits during leave). There is no evidence suggesting that any of Farm Bureau's actions before terminating Mr. Patton, including Mr. Patton's probation, disadvantaged any aspect of his job. At most, Mr. Patton's reprimands, work plans, and probation were designed to help him meet Farm Bureau's sales expectations—expectations to which he was always subject and that were applied to all Farm Bureau agents equally. That is not enough. *See Zhuang v. Datacard Corp.*, 414 F.3d 849, 854 (8th Cir. 2005) (finding no adverse employment action when employer assigned a mentor and provided negative feedback about job performance because plaintiff introduced no evidence that these methods were anything more than benefits designed to give her a chance to improve); *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) (finding that placement on a performance improvement plan was generally not a materially adverse employment action).

Accordingly, to establish causation, Mr. Patton must prove that his report of Mr. Lacey was the but for cause of Mr. Patton's termination. *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020). This means that Mr. Patton must prove that if he had not reported Mr. Lacey, he

would not have been fired.  *Id.*  There can, of course, be multiple but for causes of an employee's termination, but the protected activity must be one.  *Id.*

Mr. Patton's theory of causation is unclear, but it appears that he primarily argues that because he was terminated shortly after reporting Mr. Lacey's misconduct, the temporal connection raises an inference of causation.  Mr. Patton is correct that "[t]he requisite causal connection [between protected activity and an adverse employment action] *may* be proved circumstantially by showing the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive."  *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 715–16 (8th Cir. 2000) (emphasis added).  However, generally, more than a "temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation[.]"  *Id.* at 716.

Here, the length of time between Mr. Patton's protected activity and his termination is too great, and any causal inference the temporal relationship does create is eviscerated by the fact that Farm Bureau's concerns about Mr. Patton's performance significantly pre- and postdate any protected activity.

To begin, Mr. Patton's was terminated 47 days after he reported Mr. Lacey's misconduct.  As a matter of law, too much time elapsed to create an inference of causation between Mr. Patton's protected activity and his termination.  There is no concrete rule for evaluating the time between protected activity and an adverse employment action; whether an inference of causation arises will turn on the facts.  Even so, the Eighth Circuit has reversed a district court for finding that even a month between protected activity and termination is sufficient to make a submissible case of retaliation.  *Nelson v. J.C. Penney Co., Inc.*, 75 F.3d 343, 346–47 (8th Cir. 1996); *see also Kipp v. Missouri Highway & Transp. Comm'n*., 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of two

months between the complaint and Ms. Kipp's termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link."). On the facts before the Court, the 47 days between Mr. Patton's report and his termination is insufficient as a matter of law, both because of the significant amount of time that passed between protected activity and termination and because of the various ways in which the causal inference was undercut by Mr. Patton's pervasive performance issues.

For example, when an employer's concerns about an employee's performance predate any protected activity, any causal inference is weakened. *Carrington v. City of Des Moines*, 481 F.3d 1046, 1051 (8th Cir. 2007); *see also Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004) (holding the plaintiff failed to show a causal connection between her complaints and her discharge because the plaintiff was disciplined for the same performance and attendance problems both before and after her protected activity). As early as 2011, Farm Bureau communicated its concerns regarding Mr. Patton's performance as an insurance agent. Mr. Patton's lackluster performance continued throughout 2013 and 2014. Drawing all inferences in Mr. Patton's favor, Mr. Patton began meeting his sales targets in 2014, but trouble resurfaced in 2018. Starting in January 2018, Farm Bureau explained to Mr. Patton that he needed to improve his production numbers; Mr. Patton testified that he understood both that he needed to improve and that his production numbers were important to Farm Bureau. Doc. 134-1, at A-13–A-14, at 108–109; A-15, at 110; A-16, at 118; A-17–A-18, at 128-129. From January 2018 to January 2019, Farm Bureau repeatedly discussed Mr. Patton's poor performance with him and reiterated

its production expectations. After more than a year of failing to meet Farm Bureau's expectations, Farm Bureau escalated its response. Mr. Patton's supervisor, Mr. DeBoutez, met with Mr. Patton in person to discuss Mr. Patton's performance and to attempt to help Mr. Patton improve his sales. Mr. DeBoutez directed Mr. Patton to prepare a list of concrete steps to improve his production, and Mr. DeBoutez placed Mr. Patton on an improvement plan, which included specific production expectations. *Id*., at A-80. Farm Bureau's consistent outreach regarding Mr. Patton's performance—which Mr. Patton admitted he understood to mean that he was underperforming and needed to improve—undercuts the causal connection Mr. Patton attempts to make between his protected activity and his termination.

Similarly, unprotected misconduct by a plaintiff *after* protected activity also erodes "any causal connection that was suggested by the temporal proximity [between] his protected conduct and his termination." *Scroggins v. Univ. of Minnesota*, 221 F.3d 1042, 1045 (8th Cir. 2000). Farm Bureau's concerns postdated Mr. Patton's report of Mr. Lacey's misconduct. By April 2019, Mr. Patton was still not meeting expectations. As a result, several Farm Bureau employees met with Mr. Patton at Farm Bureau's headquarters in Jefferson City to discuss his performance on April 18, 2019. Doc. 157-22, at 21:7–24. At that time, Mr. Patton had known about Mr. Lacey's conduct for, at minimum, several months, and chose not to raise it until after Farm Bureau called a meeting to address Mr. Patton's persistence performance issues, and even then, only after Mr. Patton was told the status quo could not continue. Doc. 157-21. After Mr. Patton reported the misconduct, Farm Bureau told him that it would look into his report, but that, in the meantime, it was dedicated to improving his long-established performance issues. As a result, Farm Bureau asked Mr. Patton if additional training would be helpful, or if there was other support Farm Bureau could provide. Farm Bureau required Mr. Patton to meet certain goals towards his work plan by the end of April

2019. If he did not, Farm Bureau told Mr. Patton that he would be placed on probation, the requirements of which Farm Bureau also discussed. Farm Bureau's expectations did not change after Mr. Patton made his report; Mr. Patton was asked to make progress towards the work plan created *before* any protected activity.

Mr. Patton signed a typed document summarizing the meeting at the April 2019 meeting. This signed summary reflects the requirements of his work plan and Farm Bureau's position that Mr. Patton was not meeting the requirements of his work plan or Farm Bureau's minimum expectations. Further, by signing, Mr. Patton certified that he understood that "corrective action" was required, that a failure to make improvement would lead to probation effective May 1, 2019, and that "noncompliance" would result in potential consequences. Doc. 134-1, at A-84.

Mr. Patton failed to improve, and consequences followed. When Mr. Patton failed to meet the necessary requirements by the end of April 2019, he was placed on probation, effective May 1, 2019, just as Farm Bureau warned.[11] And again, when Mr. Patton failed to make any meaningful progress towards complying with the requirements of his probation—which were previewed at the April 2019 meeting—he was terminated on June 4, 2019. Because Mr. Patton's performance issues continued after his protected activity, the inference that the protected activity and Mr. Patton's termination are connected is further weakened. *Scroggins*, 221 F.3d at 1045; *Kiel v. Select*

---

[11] Mr. Patton appears to argue Farm Bureau acted improperly because the form acknowledging Mr. Patton was being placed on probation was not executed until May 8, 2019, even though his probation was effective May 1, 2019. Even so, Farm Bureau advised Mr. Patton of its expectations in April 2019, and told him that if he failed to meet them, he would be on probation, effective May 1, 2019. Farm Bureau also explained the requirements probation would place on Mr. Patton. Mr. Patton signed a document on April 18, 2019, certifying as much. Doc 134-1, at A-84. Mr. Patton knew his sales numbers and Farm Bureau's expectations, and accordingly his failure to meet Farm Bureau's expectations was not a surprise. At bottom, the fact that the form formally acknowledging Mr. Patton was being placed on probation was executed eight days after his probation began had no practical impact on Mr. Patton or his ability to comply with Farm Bureau's expectations.

*Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (finding plaintiff's disciplinary issues—such as an angry outburst in front of coworkers and insulting another employee—after her protected activity "eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination.").

At bottom, this timeline simply does not support an inference of causation between Mr. Patton's report against Mr. Lacey and his termination. Mr. Patton had persistent performance issues which both pre- and postdated any protected activity. *See Kasper*, 425 F.3d at 504. Farm Bureau treated Mr. Patton the same as any agent who failed to meet sales minimums. Doc. 157-22, at 47:9–14. What's more, more than a month passed between Mr. Patton's report and his termination—a consequence about which he was warned in the April 2019 meeting. It simply cannot follow, without more, that Farm Bureau gave Mr. Patton not one, but two chances to obtain additional training and bring his sales performance into compliance after his protected activity only to, despite their efforts to help him improve, fire him in retaliation for protected activity that occurred more than a month prior. *See generally Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005) ("Without any evidence of retaliation, it simply does not follow that [defendant] would take all appropriate actions (e.g., transferring [employee who assaulted plaintiff]), wait a month, and then decide to lay off [plaintiff] in retaliation for her complaint.").

Mr. Patton additionally argues that the intent to retaliate can be seen through Farm Bureau's response to Mr. Patton's report of sexual misconduct; specifically, that, according to Mr. Patton, Farm Bureau covered up his report of sexual misconduct. Mr. Patton points to (1) a "sanitized" report of the April 2019 meeting; (2) the apparent destruction of a recording of the April 2019 meeting; (3) the destruction of notes taken during the April 2019 meeting; (4) Farm Bureau's

failure to investigate Mr. Lacey. It would require unbridled speculation for a jury to connect these facts to an intent to retaliate.

First, Mr. Patton argues that Farm Bureau "sanitized" the report of the April 2019 meeting because it does not include the exact language that Mr. Patton attributed to Mr. Lacey. Even so, Mr. Patton cites no evidence, nor was any contained in Mr. Patton's Substituted Appendix, to suggest that Farm Bureau *intentionally* omitted or downplayed Mr. Patton's report. Allegations are not enough to create a jury question. This is especially true because all record evidence before the Court suggests that Farm Bureau was aware of the content of Mr. Patton's report and responded accordingly. For example, Mr. Cox, Farm Bureau's Director of Sales, openly testified to the exact language Mr. Patton attributed to Mr. Lacey. Doc. 157-22, at 25:15–20 ("They were having a conversation, and then Skyler [Lacey]'s response to her was something to the effect of, are you on the rag or something of that nature."). Mr. Cox further testified that he was surprised that the April 2019 meeting was the first he was hearing about Mr. Lacey's misconduct and that he found the comment to be inappropriate and horrific. *Id.* at 25–26. Even though Farm Bureau's memorandum did not explicitly include the exact words Mr. Patton attributed to Mr. Lacey, Farm Bureau did not—and does not—deny the language he used. Farm Bureau also followed up with Ms. West, because of Mr. Patton's report, who denied that Mr. Lacey's conduct offended her in any way. Doc. 157-25.

Put simply, a reasonable jury could not find retaliatory intent from the fact that Farm Bureau did not include the exact language Mr. Patton attributed to Mr. Lacey in a report meant to summarize a meeting with Mr. Patton called to discuss his performance issues, not any misconduct by Mr. Lacey. This is especially so given that no one *denies* the content of Mr. Patton's report and

that Farm Bureau followed up with Ms. West, who confirmed Mr. Patton's report, but denied that Mr. Lacey had ever offended her.

Next, Mr. Patton attempts to suggest a cover up by arguing that Farm Bureau destroyed the notes Farm Bureau's Director of Human Resources, Jenna Korsmeyer, used to create the memorandum summarizing the April 2019 meeting. Mr. Korsmeyer took notes—by hand on a legal pad—during the April 2019 meeting and used those notes to prepare a summary memorandum. Doc. 157-23, at ECF 5, 85:3–21. Once Ms. Korsmeyer finished and circulated the summary memorandum, she threw away her handwritten notes. Mr. Patton does not suggest that Mr. Korsmeyer was under an obligation to keep the notes at that time, and, even drawing all inferences in Mr. Patton's favor, no reasonable jury could infer retaliatory intent from the fact that handwritten notes were thrown away after a typed summary was circulated. Mr. Patton simply suggests that these notes would confirm the exact wording of his report. No one denies (or has evidence disputing) that Ms. Patton told Farm Bureau that Ms. West came to him in tears because Mr. Lacey said something to the effect of "are you on the rag?"

Mr. Patton similarly argues that Farm Bureau demonstrated retaliatory intent by destroying a recording of the April 2019 meeting. While the Court found no evidence supporting this assertion in Mr. Patton's Substituted Appendix, even assuming that it is true, it would be unreasonable for a jury to conclude that Farm Bureau destroyed the recording because it was attempting to cover up Mr. Patton's report. And again, at most, Mr. Patton suggests that the recording would have corroborated the exact language that Mr. Patton used when reporting Mr. Lacey's conduct. As discussed, regardless of the exact language, Farm Bureau thought the situation was serious enough to send Mr. West's supervisor, Melissa Smith, to speak with Ms. West. Ms. West explained that Mr. Lacey's conduct did not offend her. In short, even drawing

all inferences in Mr. Patton's favor, to the extent the April 2019 meeting was recorded, there is no evidence suggesting that Farm Bureau was under an obligation to preserve it or that it was intentionally destroyed to hide its contents. Because Farm Bureau does not dispute that Mr. Patton reported Mr. Lacey's misconduct, or the contents of that report, it would be unreasonable for a jury to conclude that a destroyed recording, in this context, indicated a retaliatory intent.

Mr. Patton also takes issue with Farm Bureau's investigation into Mr. Lacey's misconduct. Farm Bureau's Director of Human Resources sent Ms. West's supervisor, Melissa Smith, to look into Mr. Patton's report shortly after he made it. After spending more than an hour meeting with Ms. West, Ms. Smith drafted a detailed summary indicating that Ms. West was not at all concerned by any of Mr. Lacey's conduct. Doc. 157-25. Even accepting that Ms. West told Mr. Patton a different story in the Fall of 2018, what matters is that, when Farm Bureau followed up with Ms. West, she denied being offended by Mr. Lacey. Mr. Patton introduced no evidence to suggest that Farm Bureau's summary of the meeting with Ms. West was inaccurate or incomplete. Mr. Patton faults Farm Bureau for not doing more, such as speaking to Mr. Lacey or Mr. Patton, and for sending Ms. Smith, who did not fully understand Farm Bureau's policies or what would constitute impermissible discrimination. Even so, Ms. West did not *complain* about Mr. Lacey to Ms. Smith—or anyone besides Mr. Patton—at all. Even if Mr. Patton can quibble with Farm Bureau's methods, nothing changes the fact that the only person to complain about Mr. Lacey's comment was Mr. Patton. A jury could not reasonably conclude that, because Farm Bureau did not investigate further after speaking with Ms. West—who expressed no concern about Mr. Lacey's conduct—it was trying to cover up Mr. Patton's report of Mr. Lacey's misconduct and therefore terminated Mr. Patton.

Finally, Mr. Patton argues—various times and in many ways—that Farm Bureau's expectations were illegitimate and arbitrary because they were not individually tailored to Mr. Patton's market (all agents were held to the same expectations) or supported by specific demographic data.[12] Simply put, Mr. Patton maintains that meeting Farm Bureau's expectations was impossible for him. Drawing all inferences in Mr. Patton's favor, he explained as much to his supervisors consistently throughout 2018 and 2019, and in both the January and April 2019 meetings regarding his performance. Mr. Patton argues that at no time did anyone at Farm Bureau rebut his arguments regarding the reasonableness of their expectations. Mr. Patton further argues that Farm Bureau's requirement to sell Farm Bureau Federation memberships, in addition to insurance, significantly hindered his ability to sell insurance at the level expected by Farm Bureau.

It is not within this Court's authority to question the wisdom or attainability of Farm Bureau's sales policies. *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) ("It has become a commonplace for this court to observe, and it observes again here, that the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."). "[A]n employer has the right to . . . assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge—for good reason, bad reason, or no reason at all, absent intentional . . . discrimination." *Walker v. AT & T Phone Ctr., Inc.*, 995 F.2d 846, 849–50 (8th Cir. 1993). At

---

[12] Mr. Patton's argument about the reasonableness of Farm Bureau's expectations can be read to address both the causation element of his *prima facie* case and to suggest Farm Bureau's proffered justification for termination—Mr. Patton's lack of production—was pretext. Whether the Court examines Mr. Patton's argument "under the third element of the prima facia case or under the subsequent step of the defendant's legitimate, nondiscriminatory reason for its actions . . . the result is the same." *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005).

bottom, Mr. Patton argues that because Farm Bureau's policies were unrealistic, and because Farm Bureau did not respond to Mr. Patton's critiques of those expectations, none of Farm Bureau's reprimands for not meeting those expectations should matter. That is not the law. The Eighth Circuit has made clear that an employer may "develop as many arbitrary, ridiculous[,] and irrational policies as it sees fit[,]" as long as those policies are applied in a nondiscriminatory manner. *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 n. 3 (8th Cir. 1985).

Mr. Patton does not claim—nor does evidence support—that Farm Bureau applied its expectations in a way that reflects a retaliatory intent. While Mr. Patton found the expectations unreasonable, he consistently testified that he understood at the time that his sales production was important and that he would try to improve. Further, there is no evidence that Farm Bureau did not take its expectations seriously or actually enforce them against employees. To the contrary, Mr. Patton testified at his deposition that it is "not just [Mr. Patton]" that Farm Bureau expected to meet its expectations. A-13, at 108:3–6. Even if Mr. Patton found Farm Bureau's expectations unreasonable or unattainable, it is undisputed that all agents—even those in similar markets—were held to them. Mr. Patton does not argue—let alone present evidence—for example, that agents in other markets like his also consistently failed to meet expectations yet were not terminated. What's more, Mr. Patton does not suggest that the other agent in his own office—Mr. Lacey—was unable to meet Farm Bureau's sales expectations. In short, on the record before the Court, whether Farm Bureau's expectations were reasonable or attainable is irrelevant. "[I]t is not the prerogative of the courts or a jury to sit in judgment of employers' management decisions." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).

There is no evidence that Farm Bureau terminated Mr. Patton because of protected activity that occurred during a meeting pre-arranged to discuss Mr. Patton's pervasive performance

28

deficiencies. Farm Bureau's expectations were consistent and applied to every Farm Bureau agent in Missouri. They were communicated to Mr. Patton before he reported Mr. Lacey, and they remained the same after. At each juncture, Mr. Patton simply failed to perform, despite Farm Bureau's persistent—and escalating—efforts to provide additional training and resources for him to do so. Title VII does not insulate an employee from discipline for violating the employer's rules, no matter how unreasonable, as long those rules are not applied in a discriminatory manner. *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004); *see also Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) ("Filing a complaint [of discrimination] does not clothe [the plaintiff] with immunity for past and present inadequacies." (internal quotation omitted)); *Smith*, 770 F.2d at 723 n. 3. Accordingly, Mr. Patton's report is not a shield against his well-established performance issues, and, given the timeline of this case, there is no evidence suggesting that, but for Mr. Patton's report of Mr. Lacey, he would not have been terminated. *Erenberg*, 357 F.3d at 793 (finding causal chain interrupted when defendant consistently disciplined plaintiff for the same performance and attendance issues throughout her employment, both before and after her complaint).

Because there is no evidence from which a reasonable jury could conclude that Mr. Patton's protected activity was a but for cause of his termination—meaning that if he had not reported Mr. Lacey, he would not have been terminated—he has failed to present a submissible *prima facie* case for retaliation under Title VII. Therefore, Farm Bureau's Motion for Summary Judgment is GRANTED as to all Defendants.[13]

---

[13] Because Mr. Patton fails to make a *prima facie* case, the Court need not discuss whether Farm Bureau's proffered explanation for Mr. Patton's termination—his performance issues—was pretextual. *Cheshewalla*, 415 F.3d at 853 (concluding that a district court need not reach pretext analysis if the plaintiff does not adequately establish a *prima facie* case). Nevertheless, on these facts, the pretext and causation analyses are essentially the same, and accordingly the Court also

### III.    CONCLUSION

For the reasons discussed above, the Court GRANTS Farm Bureau's Motion to Strike.

Doc. 160.  The Court further GRANTS Farm Bureau's Motion for Summary Judgment against all

Defendants.  Mr. Patton failed to exhaust his MHRA claim and failed to make a submissible Title

VII retaliation case against any Defendant.  For that reason, the Court does not reach the issue of

*which* Farm Bureau entity (or entities) is the proper defendant.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: 10/12/2022
Jefferson City, Missouri

---

holds that Farm Bureau's explanation was not pretext.  *Id.* at 852 ("Whether we cabin our examination of these intervening events under the third element of the prima facie case or under the subsequent step of the defendant's legitimate, nondiscriminatory reason for its actions, the result is the same.") (internal citation omitted).